Mary Tetzlaff, Frieda M. Neils, and Walter B. Tetzlaff, as Executors v. Commissioner.
Tetzlaff v. Commissioner
Docket No. 108457.
United States Tax Court
1943 Tax Ct. Memo LEXIS 499; 1 T.C.M. (CCH) 461; T.C.M. (RIA) 43034; January 22, 1943
*499 1. Certain transfers of stock and securities made by decedent to his wife and children in November 1935 and January 1936, were not made in contemplation of death. 2. By a trust instrument dated November 29, 1922, decedent transferred property in trust with income therefrom payable, after a 10-year period, to decedent's wife during her life and upon her death to decedent's children. The trust provided that the corpus should be divided equally among decedent's four children but not to be paid until any such child should be 30 years old. It further provided that within six months after the wife's death the donor had the right to postpone for 20 years the distribution to any or all of his children, irrespective of the children's ages. If the donor should exercise such power the majority of the children living were empowered to select the recipient of any or all of the income from the trust. Held, that decedent's transfer in trust was not within the scope of section 811 (d) (2), Internal Revenue Code. Estate of Edward Lathrop Ballard, 47 B.T.A. 784, followed. L. E. Melrin, Esq., 1360 Northwestern Bank Bldg., Minneapolis, Minn., and Stanley B. Houck, Esq., 1360 *500 Northwestern Bank Bldg., Minneapolis, Minn., for the petitioners. S. U. Hiken, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined a deficiency of $9,380.24 in the estate tax of the estate of Eugene Tetzlaff, deceased. He also seeks an increase of an unnamed amount by reason of additional stipulated transfers and also a transfer as claimed in his amended answer. The issues are: 1. Whether or not the transfer of certain stocks made by the decedent to his wife and children in 1935 and 1936 were in contemplation of death. 2. Whether or not the enjoyment of the income from such transfer to his wife on November 1, 1935, was retained by the decedent during his life. 3. Whether or not the decedent retained the power to alter or amend the terms of the trust instrument which transferred certain property for the benefit of his wife, by a trust instrument dated November 29, 1922. Findings of Fact The petitioners are the duly qualified executors of Eugene Tetzlaff, deceased, who died on August 10, 1939, at the age of 74 years. The cause of his death was cancer of the stomach. The petitioners filed their estate tax return with the Collector *501 of Internal Revenue for the District of Minnesota. The decedent was survived by the following: Name
Relationship to Decedent
Date of Birth
Mary Tetzlaff
Wife
October 18, 1867
Walter Tetzlaff
Son
May 31, 1892
Arthur Tetzlaff
Son
May 5, 1896
George Tetzlaff
Son
July 3, 1898
(Died in 1941)
Frieda Neils
Daughter
August 5, 1894
Henry J. Neils
Son-in-law;
husband of
Not in record
Frieda Neils
Barbara Anne Tetzlaff
Grandchildren;
September 14, 1922
daughters of
Catherine N. Tetzlaff
Arthur Tetzlaff
September 5, 1928
Mary Louise Neils
Grandchildren;
May 17, 1919
children of Henry J.
Henry Eugene Neils
and Frieda Neils
March 5, 1922
Elizabeth Patricia Neils
May 19, 1927
The decedent started and built up several enterprises. They were the Flour City Ornamental Iron Company, hereinafter called "Flour City", engaged in the architectural metal business in Minneapolis; the Dominion Bronze and Iron Company, hereinafter called "Dominion", engaged in a similar business in Winnipeg, Canada; the Northwestern Marble Corporation, of Minneapolis, hereinafter called "Marble", and the Northwestern Realty Holding Company, hereinafter called "Realty". *502 The decedent had started the Flour City business prior to 1901. It was incorporated in 1916. The decedent and members of his family held a majority of the stock. The decedent was president and general manager of the company from 1916 to August 10, 1939, except for a period of about three years during which Flour City and Dominion were merged with the General Bronze Corporation, hereinafter called "General". Flour City was not dissolved but remained inactive during that period. Immediately after the merger in the fall of 1929 the stock market crash occurred. The decedent and other former officers of Flour City then realized that the merger had been a grave error and began to take steps to restore to Flour City and Dominion their former functions. After many extended conferences with officials of General, the merger was dissolved in March, 1933 and the stock of Flour City and Dominion was transferred to the decedent, the members of his family and his friends who formerly had owned it, in approximately the same proportions as before the merger. One condition of the transaction was that Flour City should have sufficient capital to complete the pending contracts which were assigned to *503 it. In order to obtain the credit required to support the consequent operation, the decedent became guarantor of Flour City on a bank loan or a letter of credit. That loan remained in force for about two years when additional funds were needed. These were secured from the Federal Reserve bank but the decedent declined to guarantee the loan and the company and the decedent's sons became liable for its payment. Certain additional facts were stipulated and as so stipulated are adopted as findings of fact. In so far as material to the issue they are substantially as follows: From September 30, 1912, to and including the date of the decedent's death, the issued and outstanding capital stock of Realty consisted of 2,028 shares of common stock, which was the only class of stock outstanding. Of said 2,028 shares the only shares which decedent ever owned were 767 shares, and he owned said 767 shares at all times from at least August 5, 1929 to November 15, 1935. Realty is and has been at all times since its inception a holding company and its only activity at all times has been that of owning and renting a business building in the business section of Minneapolis, Minnesota. The Northwestern *504 Marble Corporation, a Delaware corporation, became the successor of the Northwest Marble and Tile Company, a Minnesota corporation, on February 1, 1930. Marble's issued and outstanding stock since at least 1931 has consisted of 36,000 shares of common, and 775 shares, in the aggregate, of First and Second Series non-voting seven per cent preferred. Of such 36,000 shares of issued and outstanding common stock the only shares which the decedent ever owned were 4,125 shares and he owned said 4,125 shares at all times from February 1, 1930 to November 15, 1935. Immediately following the transfers of November 15, 1935, and until January 13, 1936, the decedent continued to own 2,925 shares of the 4,125 shares theretofore owned by him. On January 13, 1936 he transferred by gift 730 shares to each of his children, Frieda Neils, George Tetzlaff, Arthur Tetzlaff and Walter Tetzlaff. Of the preferred stock the only shares which the decedent ever owned were 290 shares and he owned them at all times from 1930 to the date of his death. The value of these 2,920 shares/of common stock on the date of the decedent's death was $17,520. Since May 23, 1933 the capital stock of Flour City has consisted *505 of one class of stock of which 100,000 shares with a par value of $5 per share have at all times been authorized. On July 27, 1933 there were 80,365 shares issued and outstanding. Of said 80,365 shares the shares owned on July 27, 1933 by the decedent, his wife and his four children were as follows: Number of
Owner
shares owned
Eugene Tetzlaff (decedent)
3,586
Walter Tetzlaff
9,951
George Tetzlaff
2,880
Frieda Neils
3,000
Arthur Tetzlaff
2,580
Mary Tetzlaff
3,304
Total
25,301
Immediately prior to November 15, 1935 the decedent, his wife and his four children owned shares of Flour City as follows: Number of
Owner
shares owned
Eugene Tetzlaff
4,536
Walter Tetzlaff
8,241
George Tetzlaff
1,215
Frieda Neils
3,000
Arthur Tetzlaff
2,480
Mary Tetzlaff
3,504
Total
22,976 Immediately following November 15, 1935, the decedent owned eight shares and his wife, Mary Tetzlaff, on November 17, 1935, owned 450 shares of Flour City stock. On July 27, 1933, Henry J. Neils, the husband of Frieda Neils, owned 9,506 shares of said stock and immediately prior to November 15, 1935, he owned 6,906 shares. For several months both prior and subsequent to November *506 15, 1935, there were issued and outstanding 89,826 shares of Flour City stock. This was 9,461 more shares than were issued and outstanding on July 27, 1933, and such difference is accounted for by the fact that during the period from July 27, 1933 to November 15, 1935, the company issued that many more shares of its authorized stock. However, none of such newly issued stock was issued to the decedent or to any of his children. On June 19, 1939, Arthur Tetzlaff transferred to Mary Tetzlaff 175 shares of Flour City stock; on the same date Walter Tetzlaff transferred 100 such shares to her and also on the same date George Tetzlaff transferred 211 such shares to her. Prior to the decedent's death and subsequent to November 15, 1935, the decedent acquired by purchase 528 shares of Flour City stock. Such was owned by him at the time of his death. The record discloses the following further facts: In 1924 the decedent was worth from $300,000 to $400,000. In November 1935 his net worth was about $400,000, or a little greater. Walter Tetzlaff has been employed by Flour City continuously since the fall of 1912. Arthur Tetzlaff and Henry J. Neils have been so employed since 1917 and George *507 Tetzlaff was so employed from 1917 to the date of his death in 1941. The decedent had many conversations with his son Walter relating to the disposition he had planned to make of his stock in Flour City, Dominion, Marble and Realty. He likewise discussed the same matter with Henry Neils, Wallace Schorr, the production manager of Flour City, and L. E. Melrin, the decedent's attorney. These conferences first began in 1924. The decedent stated that he had established a trust fund to provide income for his wife; and he had accumulated savings which, if increased as expected, would be sufficient for his own needs; that he was proud of his business and wanted his sons to continue to carry it on; that he wanted to give them a substantial interest in the business and to keep them together in its operation, particularly Arthur, who had wanted to start a venture of his own; and that he wanted to retire, to travel with his wife and to enjoy life. In 1928 he stated that he was clear of debt and wanted to turn the management of Flour City and the other companies over to his sons. However, shortly thereafter the decedent began negotiations for the merger with General. A condition of that transaction *508 was that he should remain with General as first vice-president in charge of its Western Division. When the merger was dissolved in 1933 the decedent stated that his original plan of distributing stock to his children still persisted and that he would complete it as soon as his bank guarantees were not needed. Upon the decedent's release from his obligations as guarantor he proceeded with his plan of distribution. Certain bonus stock was acquired upon the dissolution of the merger. The decedent refused to accept any of it but directed that it be issued to the active officers who were to assume the responsibility and do the work during the anticipated reconstruction period of the business. In the early part of 1935 the decedent was in Florida and returned therefrom in May of that year. He then stated that since the boys had demonstrated that they were able to run the company, the financial burden had eased and the business outlook was bright, he was going to turn the management over to his sons and his son-in-law. He was prevented from concluding the distributions by a strike which was settled in September, 1935. In October 1935 he outlined his plan in detail to his son-in-law, Henry *509 Neils, and stated to him that his daughter Frieda would share therein and that Neils would benefit indirectly thereby. He then called his attorney and recounted the history of his distribution plan and the events which prevented its consummation. He also stated that his wife had planned a similar and simultaneous distribution of her stock. Thereupon he had the following letter prepared and sent to his children: November 4, 1935. Mrs. Tetzlaff and I have distributed to you shares of stock in the following companies, which, with other shares of stock in the Northwestern Marble & Tile Company which I intend to transfer to you after January 1st, 1936, will be as follows: Dom. Bronze
N. W. Realty
N. W. Marble
Flour City Co.
Frieda Neils
28 shares
190 shares
1855 shares
2800 shares
Walter Tetzlaff
29 shares (sic)
190 shares
1855 shares
2800 shares
Arthur Tetzlaff
29 shares (sic)
190 shares
1855 shares
2800 shares
George Tetzlaff
29 shares (sic)
190 shares
1855 shares
2800 shares
As you know, these companies have been built up through my lifetime to a great extent by my efforts, and are practically all controlled by the Tetzlaff family by the ownership *510 of the majority of outstanding stock. I am of the opinion that these companies can now be operated successfully by my children. It is my desire to be relieved of as much responsibility as possible in the management of these companies, as I intend to travel extensively. It would give Mrs. Tetzlaff and me great pleasure if you should continue to manage these companies successfully and if you should all work harmoniously to effect this. It is my desire, but not a condition imposed by either Mrs. Tetzlaff or myself on these gifts, that you retain this stock in these companies during Mrs. Tetzlaff's and my lifetime, as we should be grieved to learn that these companies, which we have built up, are controlled by others than the Tetzlaff family. On or about October 11, 1935, the decedent stated that his wife had paid the household bills, including the chauffeur and maid's wages, but that because her income from investments had dwindled she was unable to pay such bills. He then added that he was going to deliver to her some securities so that she could take care of the bills. He later said that he had done so. On November 1, 1935, the decedent transferred to Mary Tetzlaff bonds and stocks *511 valued at $28,391.50. On November 15, 1935, the decedent transferred to Walter Tetzlaff, George Tetzlaff, Frieda Neils and Arthur Tetzlaff stocks of the aggregate value of $9,600., $10,716., $10,675., and $10,716., respectively, as appears in the petitioner's estate tax return above mentioned. On July 9, 1932, the decedent first required the services of the physician who attended him continuously but at irregular intervals until his death. At that time the decedent suffered from arthritis. On May 23, 1935, the decedent was treated for anemia which caused him some discomfort and produced a slight degree of weakness but was not serious. He had a moderately high blood pressure. Later in 1935 the decedent was troubled with minor complaints, relating particularly to digestion, but they also were not serious. His condition improved during that year. His last visit to his physician in 1935 was in October. Thereafter his physician did not see him until June, 1936. In 1936 the decedent had some discomfort and was concerned about the anemia. He was inquisitive and wanted to know the exact details of his condition. He kept track of every laboratory blood examination. In 1937 and 1938 the anemia *512 persisted. The decedent studied the subject of the digestive apparatus and became much interested in the situation. At no time was he seriously ill prior to his last illness. The decedent frequently discussed his condition with his physician, who minimized it because the decedent was concerned about it. In January 1939 decedent complained of a pain in the upper left quarter of the abdomen. An X-ray examination showed a stomach lesion, diagnosed as an ulcer but later definitely healed. A few months later a carcinoma in the same area led to his death in August, 1939. The cancerous condition was not present before January 1939. The decedent was energetic, aggressive, and active mentally. He was jovial and robust. At the November 1938 directors' meeting his relatives first noticed that he looked a little pale and anemic. On August 23, 1933, decedent executed a will by which he bequeathed his real estate and certain household and other personal property to his wife, made two specific bequests and gave the remainder to his children. The will recited that the testator had made ample provision for his wife. On November 4, 1935, the decedent executed a new will in which he made the same *513 specific bequests and bequeathed his entire residual estate to his wife. If she should predecease him the residual estate would pass to his children. The will also recited that ample provision had been made for the children. On November 29, 1922 the decedent executed a trust agreement under which he transferred certain property for the following pertinent purposes: First: For the term of ten years from the date of this Trust Agreement (unless modified as hereinafter provided), the net income from the trust fund shall be reinvested and added to the principal. Second: From and after the termination of said ten year period, the net income from the then trust fund shall be paid to MARY TETZLAFF, the wife of the DONOR, in quarterly installments for the term of her natural life. Third: Notwithstanding the foregoing provision relating to an accumulation period of ten years, said MARY TETZLAFF, after the expiration of five years from the date of this Agreement and with the written consent of the oldest child of the DONOR then living, may by written direction to the TRUSTEE terminate said period of accumulation so as to permit the paying to said MARY TETZLAFF, of the net *514 income from the then trust fund thereafter. Fourth: Upon the decease of MARY TETZLAFF, the wife of the DONOR, the trust fund shall then be divided equally between the children of the DONOR, namely: WALTER TETZLAFF, FRIEDA NEILS, ARTHUR TETZLAFF and GEORGE TETZLAFF, but no principal shall be paid to any child of the DONOR until such child has attained the age of Thirty (30) years; the net income from the undistributed share of such child to be paid to such child in semi-annual installments in the meantime, provided, however, that at any time within six (6) months after the decease of said MARY TETZLAFF, the DONOR shall have the right by written direction to the TRUSTEE to postpone the time of distribution to any or all of said children for a period not exceeding twenty (20) years, from that time irrespective of the ages of said children, and any such modification so made shall control as to the distribution of principal to said children with the same effect as if made a part of this original document. It is provided further that should the DONOR at any time hereafter cause to be postponed the time for the distribution of principal that during said postponed period the majority *515 of the then living children, who are then beneficiaries of the income from the trust fund, shall have the power to appoint the persons to whom all or any part of the net income from this trust shall be paid for part or all of said postponed period. Such power of appointment shall be exercised by written certificate to be delivered to the TRUSTEE. Should there be only two children then living, who are the Donees of such power, then the older of said children shall be considered a majority hereunder. Fifth: The surviving child of any deceased child of the DONOR shall take the same share of income and of principal and at the same date their deceased parent would have been paid such income or principal if living. The share of any deceased child of the DONOR leaving no surviving children, shall be added to the shares of the other children of the DONOR, and the surviving children of any other deceased child of the DONOR. * * * * *
Ninth: The DONOR expressly surrenders all right and power to amend, modify, or revoke in whole or in part, the trust hereby established, except with the written consent of all of the beneficiaries herein specifically named who are then living, except *516 to the extent and under the circumstances stated in subdivision Fourth hereof. The respondent determined that the transfer of November 1, 1935, and November 15, 1935, made by the decedent to his wife and his four children, amounting to $70,098.50 in value, were made in contemplation of death and he included such values in the decedent's gross estate. In paragraph IV (a) of their petition, the petitioners charged that the respondent erred in that determination and also alleged that "the Commissioner erred in including as a part of the gross estate the value of the property transferred by decedent as referred to in subparagraph (a) of this paragraph". The parties agreed that subsequent transfers made by the decedent to his four children on January 13, 1936, and valued at $17,520, were on the same basis as those made on November 15, 1935. By his amended answer the respondent sought to include in the decedent's gross estate the sum of $18,768.63, representing the value of a remainder interest alleged to have been retained by decedent through the power to alter or amend the terms of the trust agreement of November 29, 1922. That amount was agreed to be the correct value of such power *517 if the respondent should prevail on the affirmative issue. The transfer made by the decedent on November 1, 1935 to his wife, Mary Tetzlaff, of the value of $28,391.50 was not made in contemplation of death and the four transfers made by the decedent to his children on November 15, 1935, of the aggregate value of $41,707, and the four transfers made by him to them on January 13, 1936, of the aggregate value of $17,520 likewise were not made in contemplation of death. Opinion VAN FOSSAN, Judge: The amounts which the respondent seeks to include in the decedent's gross estate are divided into four groups: 1. The value of stocks transferred to Mary Tetzlaff, the decedent's wife, on or about November 1, 1935, of the agreed value of $28,391.50. 2. The value of stocks transferred to the decedent's four children on November 15, 1935, aggregating $41,707. 3. The value of stocks of Marble transferred to the decedent's four children on January 13, 1936, at the stipulated figure of $17,520. 4. The value of the remainder interests in property transferred by the decedent on November 29, 1922, in trust for his wife, with such remainder interests to his children, and stipulated to be worth *518 $18,768.63 at the date of the decedent's death. The respondent contends that the amounts mentioned in the first three groups are properly includible in the decedent's estate because the transfers were made in contemplation of death and also that the transfer to Mary Tetzlaff was for the purpose of discharging the decedent's legal obligations to pay his household expenses. The respondent asserts that the agreed value of the remainder interests appearing in the fourth group is so includible because the decedent retained the power to alter and amend the trust instrument of November 29, 1922. The first issue involves a question of fact, i.e., whether the decedent's purposes and actions were consistent with the thought and enjoyment of life rather than with the thought and anticipation of probable death. It is unnecessary to review the record in detail. A careful study of it convinces us that the decedent's gifts of stocks and securities on November 1, 1935, November 15, 1935, and January 13, 1936, were fundamentally motivated by his desire to transfer to his sons and son-in-law the management and operation of the various businesses which he had founded, developed and made prosperous. *519 His plan had its inception in 1924 but a series of fortuitous circumstances and events interrupted, delayed and deferred the consummation of the plan until November 1935. The members of the new generation had arrived at the point where the decedent felt that it was wise and safe to entrust to them the responsibility, care and control of the enterprises which he regarded as monuments to his own ability. Furthermore, he was actuated by a desire to enjoy life free from business burdens. He intended to, and did, travel extensively. Through the gift to his wife made on November 1, 1935, he had provided for the payment of the living expenses of his wife and himself. The gifts to his children were a part of his plan to set up a scheme of living which would assure him some years of leisure after a life of business activity and achievement. The decedent's physical condition, before and at the time of the gifts, affords no ground for concluding that he contemplated death. On the contrary, his interest in and care for his health indicates that he was devoting his attention and thought to the extension of his life as long as possible. He enjoyed travel and was able to make extended trips. The *520 transfer of the stocks which he gave to his children was calculated to enable him to indulge in his habit of travel at his pleasure. The respondent points out several facts which, he claims, tend to controvert our conclusion but they are minor and when backgrounded by the decedent's obvious and proved purposes, are not inconsistent with our view. We have found as a fact that the transfers of November 1, 1935, November 15, 1935, and January 13, 1936, were not made in contemplation of death, and we so hold. The second issue involves the contention raised by the respondent in his amended answer that the trust instrument of November 29, 1922, effected a transfer by the decedent of a remainder interest which was subject to change through the exercise of a power by the decedent to alter or amend. The respondent concedes that the facts in Estate of Edward Lathrop Ballard, 47 B.T.A. 784, are substantially similar to those in the case at bar but he contends that the decision in the Ballard case is wrong. No arguments have been advanced which persuade us to change our decision in the Ballard case. In that case while the decedent's wife was living *521 she, and she alone, could exercise the power to amend or revoke. At the date of the decedent's death that power was vested in her. So here, while Mary Tetzlaff was living the decedent had no power to alter or amend. He could acquire that power only after her death. Hence, he retained no right whatever which he could have exercised at the date of his death. Day v. Commissioner, 92 Fed. (2d) 179. Cf. Albert D. Lasker, 1 T.C. 208. We reaffirm our decision in the Ballard case and, following that case, hold that the value of the so-called remainder interest in the property conveyed in trust by the decedent on November 29, 1922, is not includible in his gross estate. The respondent attempts to raise a new issue in his brief, asserting that the property transferred to decedent's wife was includible in the gross estate because, in the premises, decedent retained the enjoyment of the income for life, his contention being that the income was used to discharge the decedent's obligation to support his family and, therefore, the property comes within the provisions of section 811 (c), Internal Revenue Code. No such holding was *522 made in the notice of deficiency and no such issue was raised by the pleadings. Had respondent pleaded it in his answer and assumed the burden of proof, petitioners would have had an opportunity to meet it. We decline to consider the question. Decision will be entered under Rule 50.